UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **CHRISTINE AVERY,** as Personal Representative of the Estate of Christopher Nault, <br><br> Plaintiff, <br><br> v. <br><br> **WELLPATH, LLC**, formerly known as Correct Care Solutions, a Delaware Limited Liability Company, <br><br> **DOUGLAS HEDGPATH**, in his individual capacity, <br><br> **DUSTIN HEDGPATH**, in his individual capacity, <br><br> **MITCHELL HERRICK**, in his individual capacity, <br><br> and <br><br> **TRISTAN OBREMSKI**, in his individual capacity, <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Christine Avery, as Personal Representative of the Estate of Christopher Nault, by and through undersigned counsel, hereby complains against Defendants as follows:

### INTRODUCTION

1.  This 42 U.S.C. § 1983 civil rights action for money damages alleges a survival claim for the conscious pain and suffering of decedent Christopher Nault, who died in his cell at the Maine State Prison on November 16, 2018. This action alleges cruel and unusual punishment

1

in violation of the Eighth Amendment to the United States Constitution, arising from the custom or policy of Wellpath, LLC to deprive inmates like Nault with chronic viral Hepatitis C of necessary medical treatment. This action also alleges cruel and unusual punishment in violation of the Eighth Amendment on the part of multiple Corrections Officers who acted with deliberate indifference to the medical needs of Christopher Nault in the days and hours leading up to his death. Nault ultimately died alone in his cell, having been denied medical care that he obviously needed, from a bacterial meningitis infection that should have been detected and treated.

## THE PARTIES

2.  Plaintiff Christine Avery ("Avery") is an individual residing in the Town of Portland, County of Middlesex, and State of Connecticut.

3.  Avery is the next of kin and the duly appointed Personal Representative of the Estate of her father, Christopher Nault ("Nault").

4.  Defendant Wellpath, LLC is a Delaware limited liability company with a principal place of business in Nashville, Tennessee. Wellpath, LLC is the successor entity to Correct Care Solutions, LLC. As used herein, "Wellpath" refers to Correct Care Solutions and its employees as well as the successor entity Wellpath, LLC.

5.  At all times herein relevant, Wellpath and/or its predecessor entity had a contract with the Department of Corrections to provide medical care and treatment to inmates at the Maine State Prison located in Warren, Maine ("the prison"). In treating Nault and other inmates at the prison, Wellpath and its employees acted under color of state law.

6.  Defendant Douglas Hedgpath is sued in his individual capacity as a Corrections Officer ("CO") at the prison responsible for Nault's care and protection, who at all times herein

relevant acted under color of state law. Upon information and belief, Douglas Hedgpath resides in the Town of Prospect, County of Waldo, and State of Maine.

7. Defendant Dustin Hedgpath is sued in his individual capacity as a CO at the prison responsible for Nault's care and protection, who at all times herein relevant acted under color of state law. Upon information and belief, Dustin Hedgpath resides in the Town of Prospect, County of Waldo, and State of Maine.

8. Defendant Mitchell Herrick ("Herrick") is sued in his individual capacity as a CO at the prison responsible for Nault's care and protection, who at all times herein relevant acted under color of state law. Upon information and belief, Herrick resides in the Town of Frankfort, County of Waldo, and State of Maine.

9. Defendant Tristan Obremski ("Obremski") is sued in his individual capacity as a CO at the prison responsible for Nault's care and protection, who at all times herein relevant acted under color of state law. Upon information and belief, Obremski resides in the Town of Warren, County of Knox, and State of Maine.

## JURISDICTION AND VENUE

10. The Court has federal subject matter jurisdiction over this 42 U.S.C. § 1983 action under 28 U.S.C. §§ 1331 and 1343.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND FACTS

### Hepatitis C Virus ("HCV")

12. Christine Avery's father, Christopher Nault, had a lifelong history of substance abuse, mental illness, and drug addiction.

13. Nault was incarcerated several times in his adult life, mostly for drug-related offenses.

14. On January 5, 2018, Nault began serving a 2-year probation revocation sentence at the Maine State Prison.

15. At Nault's first chronic care visit on January 19, 2018, Richard Liberty, NP noted that Nault suffered from chronic Hepatitis C Virus ("HCV").

16. HCV is a serious, progressive viral infection that is transmitted through blood. HCV is highly contagious and common in a prison population. If left untreated, HCV can cause severe and life-threatening health problems related to liver damage, including but not limited to scarring (cirrhosis), cancer, excruciating pain, and death.

17. The accepted treatment for HCV is simple. HCV can be eradicated more than 90 percent of the time with the administration of an anti-viral oral medication known as a DAA (direct-acting antiviral). The standard course of treatment for a patient with HCV is an eight to twelve-week course of DAAs.

18. Wellpath, acting under color of state law, has developed a policy, practice, or custom of making inmates at the prison wait until their HCV progresses to the point of causing severe liver damage before they will administer DAAs.

19. HCV is a widespread human health risk within the prison, with hundreds of inmates infected at any given time.

20. Wellpath explicitly refuses to administer DAAs to inmates unless they meet certain criteria. Wellpath's custom or policy is intended solely to save the company money. Wellpath's refusal of necessary medical treatment in the form of an easily administered and safe oral anti-

viral medication amounts to outrageous, cruel, and unusual punishment in violation of the Eighth Amendment.

21.     Wellpath is responsible for developing, implementing, monitoring, and enforcing the management of HCV infection at the prison. Wellpath knowingly deprived Nault of the necessary medication to treat his HCV, despite his liver function tests and other symptoms indicating worsening, progressive, and/or severe disease.

22.     Wellpath's policy and custom of depriving inmates of DAAs for HCV caused Nault to suffer not only physical symptoms and pain, but limited vision and confusion. By the time of his death, Nault was described as "incoherent." Therefore, the DOC's grievance procedures were not "available" to Nault before he died.

23.     On January 20, 2018, Nault submitted a medical sick call slip indicating that his vision was "really bad," which can be a symptom of worsening HCV.

24.     On February 3, 2018, Nault was seen in Wellpath's medical department complaining of dental pain and blood in his urine.

25.     On February 28, 2018, Nault's liver function tests were critically high: AST of 529 and ALT of 502. Despite these readings, Wellpath and its employees took no action to treat Nault's HCV or prescribe him life-saving medication.

26.     On March 12, 2018, Nault saw a registered nurse in Wellpath's medical department for blood in his urine, which can indicate worsening HCV. The nurse noted that Nault's urine was amber in color with "positive 2++ for bili. Patient is known Hep C positive." Despite these findings, Wellpath did nothing to treat Nault's worsening HCV.

27.     Nault submitted sick call slips for ongoing pain and neuropathy, both of which can be symptoms of worsening HCV. However, Wellpath did nothing to treat Nault's HCV.

28. In March of 2018, any grievance process maintained by the prison was unavailable to Nault, because the COs in Nault's unit at times refused to allow him to even attend medical appointments.

29. The prison has a history of intimidating and punishing inmates who request medical care, making the grievance process functionally unavailable to Nault.

30. In late March, Nault submitted a sick call slip complaining of kidney stones that were "killing me."

31. Other sick call slips Nault submitted for pain went ignored, to the point where Nault indicated: "It seems [the provider] might have forgotten me?"

32. On June 25, 2018, Nault submitted a sick call slip stating as follows: "I'm thinking my hepatitis levels should be checked again, I am always tired, have no energy, and my vision is blurry."

33. After several days without a response, Nault submitted another sick call slip to Wellpath stating: "I am very sick and need cold packs or something. Please and thank you."

34. Nault had a chronic care follow up visit with Wellpath on July 6, 2018. Wellpath employee Dr. Eugenia McGarry noted in the progress note for that day: "He has hepatitis which he feels is worsening so will check [liver function tests]." Dr. McGarry ordered labs to check for Nault's liver function.

35. Wellpath never took labs or assessed Nault's HCV further, despite the July 6, 2018 order.

36. In the months that followed, Nault's vision became more impaired and he had trouble turning on the light in his cell. Inmates and COs both reported that he was incoherent at times.

37. In Nault's case, Wellpath explicitly and intentionally ignored Nault's symptoms related to HCV in an overt attempt to save money on the cost of treatment.

### Severe Dental Decay and Infection

38. Nault's dental intake screening at the time of his January 5, 2018 incarceration revealed that he had multiple decayed and broken teeth.

39. Nault had a dental exam on January 11, 2018.

40. On February 2, 2018, Nault submitted a dental sick call slip stating as follows: "I have a couple teeth like 3 I believe that are really starting to bother me and I'm hoping they can be pulled out etc. They look pretty rotted and they have been hurting me. Thanks."

41. Wellpath's medical department noted that Nault had multiple cavities but no signs or symptoms of infection. Nault was referred to dental.

42. On February 5, 2018, Victoria Matthews, DDS removed one of Nault's teeth due to "severe decay" and discussed further extractions and treatment planning. Dr. Matthews prescribed Nault Clindamycin for possible infection. Upon information and belief, he took the antibiotics as prescribed.

43. On February 22, 2018, Nault submitted another dental sick call slip stating as follows: "About a week and a half ago I got called down to dental for a cleaning and the C.O. in D pod never let me know. So by the time he told me to go to medical, I arrived late and you was unable to see me and the medical C.O. said he had called [with] time and don't worry it's [not your] fault."

44. On March 8, 2018, Nault submitted another dental sick call slip stating as follows: "I had an appointment with you for 3-5-18 at 8:30 am. I showed the C.O. my green appointment

card he wouldn't let me go or even call down. So I'm [hoping] we can reschedule? We was locked down Monday and Tuesday."

45. On March 20, 2018, Nault submitted another dental sick call slip stating as follows: "I had appointment with you in dental for a cleaning. The day my appointment was on we were locked in because of the new level system. So it wasn't a refusal and I just hope to be able to get in for a cleaning still. Please and thank you."

46. On March 24, 2018, Nault submitted another dental sick call slip stating as follows: "I am in hopes of getting my teeth cleaned still. The Monday I was supposed to we was all locked in because of the new level system."

47. Nault saw Dr. Matthews on March 26, 2018, when she noted: "Consult with pt re dentures or partials. Pt has severe bone loss but no mobility in any teeth. Rec start with acrylic partials that can be repaired for future extractions. Partials will begin after pt has Hyg visit in Oct. Pt understands."

48. On August 24, 2018, Nault submitted another dental sick call slip stating as follows: "I have a couple of teeth that I think are infected or something. Whatever it is it's putting a bad flavor in my mouth."

49. Dr. Matthews saw Nault on August 28, 2018 and ordered x-rays. Nault complained of pain with eating.

50. The next day, On August 29, 2018, Dr. Matthews saw Nault again and noted severe tooth decay. Dr. Matthews' planned on a full upper extraction of Nault's teeth and a partial extraction of his lower teeth. She prescribed him Clindamycin "for poss[ible] infection at #12."

51. Nault's extraction procedure occurred on September 5, 2018. Dr. Matthews noted "severe decay and bone loss."

52. Before and after the extraction procedure, Nault's records indicate that he refused antibiotics [Clindamycin] for possible infection. Neither Dr. Matthews nor another provider from Wellpath documented the details surrounding his refusal to take antibiotics, despite Nault's history of mental illness and the possibility of infection.

53. On October 16, 2018, Nault submitted another dental sick call slip stating as follows: "I just saw the hygienist today and got my teeth cleaned and she wants you to check out my upper left gum." The hygienist's note from October 16, 2018 revealed a "fluid filled raised lesion" on the gums, and that "patient reports removing bone fragments himself."

54. On October 24, 2018, Nault saw Dr. Matthews, who observed "sharp ledge of bone B left max molar region," and performed "osseous removal." There is no indication that Dr. Matthews prescribed further antibiotics or addressed Nault's apparent refusal to take Clindamycin.

### Final Days of Nault's Life

55. On November 12, 2018, Nault submitted a medical sick call slip stating as follows: "I have a head cold with sore throat and congestion. I'm pretty sure I need cold packs for a while."

56. Wellpath responded to Nault's request for medical assistance on November 14, 2018, although no progress note of a visit appears to have been completed. Instead, a "Nursing Documentary Pathway" was completed by Mary Grace Blumenthal, RN, who planned to order "cold packs" for Nault.

57. Wellpath Medical Director Dana Webster, DO ordered Chlor-Trimeton, Mucinex, and Tylenol for Nault to begin on November 15, 2018.

58. Nault locked into his cell, Close Echo Pod number 112, around 21:00 hours on November 15, 2018.

59. CO Dustin Hedgpath performed the prisoner count at 21:00 hours. Dustin Hedgpath admitted to Maine State Police that Nault "kept missing" the light in his cell that night when he tried to turn it on at 21:00 hours. Dustin Hedgpath asked Nault if he was ok, but by this time Nault was known to be incoherent.

60. According to another inmate, at this time Nault said to Dustin Hedgpath, "I need medical." At this time or later in the evening, a CO told Nault to "fill out a sick slip."

61. Upon information and belief based on the reports of other prisoners, Nault kicked on his cell, used his emergency call button, and/or called out for help in the night, but the CO Defendants ignored him.

62. Dustin Hedgpath recalled a prisoner ringing the emergency call button the evening of November 15-16, 2018.

63. Dustin Hedgpath admitted that he heard some prisoners talking about Nault calling out for medical help during the night and being denied "medical."

64. The CO who performed count at 5:45 am on November 16, 2018 was Douglas Hedgpath. Douglas Hedgpath knocked on Nault's cell during count and Nault did not respond. After a couple of attempts to wake Nault, Douglas Hedgpath shined his flashlight into the cell and noticed that Nault was unresponsive and positioned oddly on the bed. Douglas Hedgpath called for a medical ICS (Incident Command System).

65. COs Herrick and Obremski arrived at Nault's cell at 05:55, along with Douglas Hedgpath's brother, another CO named Dustin Hedgpath.

66. The COs turned on body camera number E9482 and began recording. Nault had partially dried dark brown coffee ground emesis all over his face, bunk, the wall, and the floor.

Upon information and belief, Nault had vomited and/or expelled significant amounts of bodily fluid on the bed, wall, and floor surrounding his bunk.

67. COs Douglas Hedgpath, Herrick, and Obremski transported Nault to medical along with Wellpath nurse Angela Cyr. Wellpath Nurse Eastman assisted in the medical department. They performed CPR for roughly 40 minutes. An airway could not be obtained because rigor mortis had set in. Nault was pronounced dead at 06:41 am.

68. Nurse Eastman later told the Maine State Police that she heard someone saying "help" around 5:45 am, but CO Douglas Hedgpath claimed that this was him calling the 5:45 am count.

69. Douglas Hedgpath told Maine State Police that when he found Nault, his body was cold. Nault's eyes were open and glossed over and the dark brown fluid around him had dried. Nault's fingers had turned blue and CO Herrick could tell that he had been dead for a while by the time they found him at 05:45 am.

70. Other prisoners in Close E Pod reported to Herrick that Nault had been denied medical; in fact, the other prisoners in Close E Pod gave Herrick a hard time and blamed him for Nault's death.

71. Herrick had a reputation for writing prisoners up for using the emergency call button in the night.

72. Herrick noticed over the past month or so that Nault's depth perception was off and he had a hard time turning on his light in the morning.

73. Obremski told Maine State Police that the overnight rounds he conducted at 01:00 and 03:00 hours were intended to make sure the prisoner is on his bunk and a body is in the cell

11

with nothing out of the ordinary. However, video of the rounds conducted by the COs does not show that anyone stopped by long enough to observe Nault or anything in his cell.

74. Obremski did not check to see if Nault was breathing during his two rounds on the overnight of November 15-16, 2018.

75. The CO Defendants walked through the Close E Pod in the hours before Nault's death every 30 minutes. Instead of observing prisoners, the COs walked by with overt and deliberate indifference, ignoring each inmate in the pod.

76. An inference exists that the COs deliberately ignored and were indifferent to Nault's medical condition not only because he had requested and been denied medical that night, but also because he vomited an immense amount of dark brown coffee ground emesis before dying, which the COs should have heard in the Close E Pod.

77. None of the COs observed Nault the evening before his death, despite their actual knowledge that he was ill, in need of emergency care, and had requested "medical."

78. The night light was working properly in Nault's cell, such that any observation of him would have revealed distress if the COs had followed standard protocol and policies in conducting rounds.

79. As resuscitation measures were being administered to Nault's body in the medical department on the morning of his death, one of the COs requested that another employee obtain the logbook containing records of rounds between November 1, 2018 and November 16, 2018. Upon information and belief, that logbook was brought to the medical department and it has since disappeared.

80. Nault was unable to submit a grievance with Defendants based on any of the foregoing deprivations of his constitutional rights due to intimidation from COs and the fact that he was incoherent, unable to see clearly, and ignored in his cell until he died.

81. Nault's autopsy revealed that he died from bacterial meningitis. Several species of bacteria were detected on autopsy. Upon information and belief, the bacteria Viridans Streptococcus found in Nault's brain is associated with infection following a dental extraction. Nault had multiple dental extractions and infections in the months leading up to his death.

## COUNT I
### (Wellpath's Official Government Policy or Custom under 42 U.S.C. § 1983)

82. Plaintiff repeats the allegations contained in Paragraphs 1 through 81 of her Complaint as if fully set forth herein.

83. Wellpath, operating under color of state law, either developed or acquiesced in the administration of policies and customs at the prison that violated Nault's Eight Amendment right to be free from cruel and unusual punishment.

84. Wellpath's policy or custom of withholding DAAs from Nault amounted to deliberate indifference to his known medical needs, which were serious and progressive.

85. Wellpath's policy or custom of withholding DAAs from Nault directly caused the constitutional violation alleged herein.

86. Wellpath's conduct in depriving Nault of treatment for his HCV was the "moving force" behind his pain and suffering for months while incarcerated.

87. Even if Wellpath did not develop the unconstitutional policy or custom described above, it acted with acquiescence in administering the policy such that liability may be imposed under section 1983.

88. Nault's estate is entitled to monetary damages for the pain and suffering he endured at the prison before his death, as alleged above.

89. Wellpath acted with such outrageous and deliberate disregard to human life that actual malice may be implied, justifying an award of punitive damages.

WHEREFORE, Plaintiff Christine Avery, as the Personal Representative of Estate of Christopher Nault, asks that this Court enter judgment in her favor and against Defendant Wellpath, LLC, and award monetary damages, punitive damages, costs and attorney's fees, interest, and such other and further relief as this Court deems just and appropriate.

## COUNT II
**(Deliberate Indifference, Cruel and Unusual Punishment under 42 U.S.C. § 1983)**

90. Plaintiff repeats the allegations contained in Paragraph 1 through 89 of her Complaint as if fully set forth herein.

91. As set forth above, COs Dustin Hedgpath, Douglas Hedgpath, Herrick, and Obremski, in their individual capacities ("the CO Defendants"), had knowledge of and observed Nault's condition in the days leading up to his death.

92. As of 21:00 hours on November 15, 2018, Douglas Hedgpath had actual knowledge that Nault appeared to need medical assistance; that he was incoherent; and that he could not perform the simple task of turning on the light in his cell.

93. CO Dustin Hedgpath acted with deliberate indifference to Nault's need for medical care on the evening before his death.

94. All four CO Defendants, acting under color of state law, displayed deliberate indifference to Nault's medical needs in the hours between 21:00 and when Nault was found dead in his cell at 05:45 hours.

95.     Based on DOCs policies and general standards within the field of corrections, all four CO Defendants subjectively understood that their rounds on the night of November 15 into November 16, 2018 were deliberately indifferent to the needs of prisoners under their care.

96.     All four CO Defendants failed to provide a reasonable response to their subjective knowledge that Nault needed medical attention.

97.     As a direct and proximate result of the four CO Defendants' deliberate indifference in violation of the Eighth Amendment, Nault endured conscious pain and suffering and the immensely cruel fate of being locked in a cell while dying from meningitis.

98.     Ultimately, the four CO Defendants' outrageous and deliberate indifference to Nault's medical needs caused his premature death from bacterial meningitis, which could and should have been treated in the medical department.

99.     Nault's estate is entitled to monetary damages for the pain and suffering he endured in the hours and minutes before his death, as discussed above.

100.    The four CO Defendants acted with such outrageous and deliberate disregard to human life that actual malice may be implied, justifying an award of punitive damages.

WHEREFORE, Plaintiff Christine Avery, as the Personal Representative of Estate of Christopher Nault, asks that this Court enter judgment in her favor and against the four CO Defendants, and award monetary damages, punitive damages, costs and attorney's fees, interest, and such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated at Kennebunk, Maine this 16th day of November, 2020.

/s/ Laura H. White
_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Road, Suite 21
Kennebunk, ME  04043
(207) 502-7484
lwhite@whiteandquinlan.com